## Affidavit

1. I, Robert Estes, being sworn, depose and state as follows:

2. I am assigned to the Drug Enforcement Administration (DEA) as a Task Force Officer (TFO). In connection with my duties and responsibilities, I have received extensive training in the field of narcotics investigation and enforcement; both formal and informal. I have also participated in investigations relating specifically to the possession and distribution of heroin, the type of drug that is being distributed by the target subject under investigation and discussed herein. I have also participated in various aspects of investigatory work, including undercover surveillance and undercover narcotics purchases, and have participated in several narcotics-related arrests and the execution of many narcotics-related search warrants. I have written affidavits in support of search and arrest warrants and frequently utilized the services of informants, and other confidential sources of information.

3. I submit this affidavit in support of a finding of probable cause to search the residence located at 87 Elm Street, Apartment 31, Winooski, Vermont (hereinafter referred to as the "Subject Property"), which is described with greater particularity in Attachment A, which is attached hereto and incorporated herein. This affidavit is to support a warrant to search for evidence and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1): distribution of controlled substances, as described in Attachment B, which is attached hereto and incorporated herein. This affidavit is further submitted to establish probable cause to believe that Tyree Pollard has violated 21 U.S.C. §§ 841(a) by distributing heroin, which is a Schedule I controlled substance under federal law.

4. The information contained within this affidavit is based upon my training, experience, and investigation, as well as information that has been conveyed to me by other law enforcement officers. The following is either known to me personally or has been related to me by persons having direct knowledge of the events described below, including other law enforcement officers involved in this investigation. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation.

5. During the week of November 30, 2015, I had contact with an Essex Police Department Confidential Source (CS1). CS1 advised it had information on a male CS1 knew as "Jack," but whose real name was unknown. CS1 stated that "Jack" was from New York City and was currently staying at 31 Elm Street in Winooski, Vermont. CS1 stated that "Jack" was selling large amounts of heroin and that "Jack" was using cellular number 917-539-1465. CS1 stated that "Jack" was bringing large amounts of heroin from New York City to Vermont. CS1 told me "Jack" was using the Facebook name "Jack Potz." CS1's criminal record includes the following: Resisting Arrest, False Written Statement, 5th Degree Conspiracy, Felony Fourth Degree, Criminal Possession Narcotic Drug, and First Degree Robbery. CS1 is cooperating with law enforcement for consideration on pending charges.

6. I asked if anyone at the DEA Burlington RO was familiar with 31 Elm Street, Winooski and learned there was no such address. However TFO Ben Adams stated that Winooski Police Department was aware of drug trafficking activity occurring at 87 Elm Street, Apartment 31. TFO Adams advised that a female named Melinda Johnson lived at this address. TFO Adams informed me that the Winooski Police Department has been to the

residence before and had contact with Johnson at the address. Social media analysis conducted by Intelligence Analyst (IA) Marilyn Epp confirmed a romantic relationship between "Jack Potz" and Melinda Johnson. "Jack Potz" commented on Johnson's Facebook page that she had a "sexy ass," to which she replied, "All yours baby". A later photograph posted on Johnson's Facebook shows "Jack" and Johnson together.

7. During the first week of December, acting in an undercover capacity, I called number 917-539-1465, however the call went unanswered. Shortly thereafter, I received a call from number 518-645-0714. The male caller identified himself as "Jack" and we spoke about the purchase of heroin. During this week, I was in contact with "Jack" via numbers 917-539-1465 and 518-645-0714. "Jack" and I discussed the price of heroin, wherein "Jack" informed me that his rate for a bundle of heroin was $100.00 and a sleeve of heroin (ten bundles) was $800.00. I told "Jack" I wanted to meet the following day to purchase heroin; however, I subsequently contacted "Jack" and informed him I was out of the state on a job and asked if I could send someone else to purchase heroin on my behalf. "Jack" asked me what I wanted and I told him I was looking for a sleeve of heroin. "Jack" told me to contact him when I was ready to purchase.

8. On December 8, 2015, IA Epp and I met with a DEA CS (CS2) at a predetermined meet location in Colchester, Vermont. I searched CS2 for drugs, contraband, or large amounts of currency, and none were located. CS2 has a prior federal misdemeanor conviction for simple possession of oxycodone. CS2 is a paid DEA CS.

9. I placed a call to "Jack" at number 518-645-0714, to finalize a heroin purchase, but this call went unanswered. I then sent "Jack" a text message to this same number. I received a responding text informing me another text would be coming with a number to call. A

few seconds later I received a text from number 518-645-0714 displaying the number 802-556-1509 for contact. I instructed CS2 to place a recorded call to number 802-556-1509. CS2 spoke with a male who acknowledged his name as "Jack." "Jack" instructed CS2 to proceed to the area of Elm Street in Winooski.

10. I provided CS2 with official funds to be utilized for the controlled purchase; it should be noted the serial numbers of the currency were recorded prior to being given to CS2. I outfitted the person of CS2 with electronic audio transmitters/recorders for the purpose of monitoring and recording the transaction.

11. It was anticipated that the transaction on this date would occur in the area of 87 Elm Street, Apartment 31, Winooski. During the pre-operation briefing, photographs of "Jack Potz" from his facebook account were handed out to everyone participating in the operation. Surveillance units were established prior to the arrival of CS2. While en route, CS2 called "Jack" who instructed them to drive to the intersection of West and Elm Streets in Winooski. Surveillance units observed a black male emerge from the rear of the target apartment building and walk toward the meet location. CS2 drove to the intersection of West and Elm Streets, where this black male was observed entering CS2's vehicle. The male instructed CS2 to circle the block. IA Epp and I observed the male subject who entered CS2's vehicle and confirmed it was "Jack Potz." While inside CS2's vehicle, "Jack" and CS2 discussed the price of the heroin and "Jack" could be heard counting money. Surveillance units observed CS2's vehicle return to the intersection of West and Elm Streets and the male departed the vehicle. TFO Merchand observed the male subject walking back toward 87 Elm Street and identified him as "Jack Potz" from the photo provided during the pre-operation briefing.

12. CS2 departed the area and was kept under continuous visual surveillance by me and IA Epp. CS2 turned over rubber-banded bundles of plain white wax style bags containing a tan powder to me. TFO McGarghan and I later field-tested one bag and it tested positive for the presence of heroin. I searched the person of CS2 and no drugs, contraband, or large amounts of currency were located. IA Epp showed CS2 a photograph from "Jack Potz's" social media profile. CS2 positively identified this as the individual who sold him/her heroin.

13. Following the above purchase, surveillance unit continued to watch 87 Elm Street, Apartment 31. SA Brandon Hope observed "Jack" exiting 87 Elm Street, Apartment 31 on a hover board.

14. TFO Adams arranged for a Winooski Police Department Police Officer to make contact with "Jack," because riding a hover board violates a Winooski City Ordinance. During this interaction, "Jack" identified himself as Khalil Pollard with a date of birth of October 27, 1989, and provided 690 Gates Avenue, Apartment 3F, Brooklyn, New York as an address. TFO Dan Merchand subsequently obtained a New York Police Department (NYPD) Criminal History for Khalil Pollard, with the same date of birth and address; however, the photograph of Khalil did not match that of "Jack". TFO Merchand learned from NYPD that Khalil has a brother named Tyree Pollard. IA Epp queried commercial databases and learned that both Khalil and Tyree share the 690 Gates Avenue, Apartment 3F, Brooklyn, New York address. A photo of Tyree Pollard was obtained from New York State. I identified "Jack Potz" as Tyree Pollard.

15. During the week of December 14, 2015, I had contact with CS2. CS2 advised it had been in contact with Tyree Pollard (still using the moniker "Jack"), and that Pollard told CS2

he had one sleeve of heroin left which he was willing to sell for $900. CS2 told Pollard they would take the sleeve of heroin and meet him later the same afternoon. Resident Agent in Charge Brian Villella, Essex Detective Chris May and I met with CS2 at a predetermined meet location in Colchester, Vermont. I searched CS2 for drugs, contraband, or large amounts of currency, and none were located.

16. Detective May provided CS2 with official funds to be utilized for the controlled purchase; it should be noted the serial numbers of the currency were recorded prior to being given to CS2. I outfitted the person of CS2 with an electronic audio transmitters/recorders for the purpose of monitoring and recording the transaction.

17. It was anticipated that the transaction on this date would occur in the area of 87 Elm Street, Apartment 31, Winooski. Surveillance units were established prior to the arrival of CS2. I had CS2 make a recorded call to the number 802-556-1509; in this, Pollard instructed CS2 to meet him at the stop sign located at the end of Elm Street in Winooski. Surveillance units observed an unknown subject exit 87 Elm Street, Apartment 31 and walk in the direction of Elm Street, where the subject met CS2 and entered the front passenger side of CS2's vehicle. Pollard instructed CS2 to loop the block and then park the vehicle. While in the vehicle, Pollard spoke about the amount of heroin CS2 was purchasing. Pollard could be heard counting the money CS2 gave him for the heroin. Pollard also spoke about being stopped by Winooski Police Department following their last deal. Pollard exited CS2's vehicle at the intersection of West and Elm Streets. SA John O'Connor observed Pollard leave the vehicle and walk in the direction of 87 Elm Street. TFO Adams observed Pollard enter 87 Elm Street, Apartment 31.

18. CS2 departed the area and was kept under continuous visual surveillance until Detective May and I met with CS2. CS2 turned over 10 knotted plastic bag corners, each containing a tan powder. TFO McGarghan and I later field-tested one bag and it tested positive for the presence of heroin. I searched the person of CS2 and no drugs, contraband, or large amounts of currency were located.

19. During the week of January 18, 2016, Pollard contacted me via phone number 919-651-6837, using his moniker of "Jack." Text communication continued over several days during which Pollard offered to sell me a sleeve of heroin for $950. It was arranged that CS2 would meet Pollard's "wife" to purchase the heroin on a morning during the week of January 25, 2015. Detective May, IA Epp and I met with CS2 at a predetermined meet location in Colchester, Vermont. I instructed CS2 to make a recorded call to number 919-651-6837. There was no answer; however, Pollard immediately returned the call from the same number. I recognized Pollard's voice from previous recorded calls. Pollard instructed CS2 to meet him at the intersection of West and Pine Streets in Winooski. I searched CS2 for drugs, contraband, or large amounts of currency, and none were located.

20. I provided CS2 with official funds to be utilized for the controlled purchase; it should be noted the serial numbers of the currency were recorded prior to being given to CS2. I outfitted the person of CS2 with electronic audio and video transmitters/recorders for the purpose of monitoring and recording the transaction. It was anticipated that the transaction would occur near 87 Elm Street, Apartment 31 in Winooski. Surveillance units were established prior to the arrival of CS2.

21. TFO Adams observed a black male fitting Pollard's description exit 87 Elm Street, Apartment 31 and walk toward the intersection of West and Pine Streets. TFO Merchand observed the subject walk through a wooded cut-through and arrive at the intersection of West and Pine Streets. SA Hoffmann observed the subject at the intersection of West and Pine Streets using his telephone. At the same time the subject as observed on the phone, CS2 received a call from number 919-651-6837.

22. Via electronic audio equipment on CS2's person, Pollard could be heard giving CS2 driving instructions to his location. CS2 drove to the intersection of West and Pine Streets and Pollard entered CS2's vehicle. Once he entered the vehicle, I observed Pollard via the electronic video equipment. Pollard instructed CS2 to loop the block. While in the vehicle, Pollard told CS2 he had seen many police on the interstate, as he had just returned from New York less than an hour before. Pollard also told CS2 he gave them a piece of crack cocaine as a sample. Pollard told CS2 he had brought his cousin with him to Vermont, to work for him so that Pollard would have less public exposure. CS2 dropped Pollard off at the intersection of West and Elm Streets in Winooski. SA O'Connor observed Pollard walk back toward the wooded cut-through and TFO Adams observed Pollard enter the rear door of 87 Elm Street, Apartment 31. Both SA O'Connor and TFO Adams recognized Pollard from photos provided during the pre-operation briefing. Shortly thereafter, SA Tom Doud observed a second male subject exit 87 Elm Street, Apartment 31.

23. CS2 departed the area and was kept under continuous visual surveillance until Detective May, IA Epp and I met with CS2. CS2 turned over 100 plain white wax style bags of suspected heroin and one piece of suspected crack cocaine to me. TFO McGarghan and

I later field-tested the purchased heroin and crack cocaine; results were positive for the presence of both heroin and cocaine. I searched the person of CS2 and no drugs, contraband, or large amounts of currency were located. IA Epp showed CS2 a picture of Pollard. CS2 confirmed that Pollard was the male who sold them heroin and gave them a sample of crack.

24. Pollard's criminal history includes the following: Criminal possession of a weapon-4th, Criminal sale controlled substance-5th degree, Robbery 3rd degree, promoting prison contraband-1st degree, petit larceny, and common law robbery.

25. Based on my training, experience, and participation in other controlled substances investigations, I know the following:

    A.    Both small and large scale drug traffickers often maintain, on hand, large amounts of U.S. Currency in order to finance their ongoing drug business;

    B.    Controlled substance traffickers commonly maintain books, records, receipts, notes, ledgers, electronic/digital data, common carrier tickets, money orders, and other documents relating to the transportation, acquisition and distribution of controlled substances;

    C.    Controlled substance traffickers commonly provide controlled substances on consignment to their clients;

    D.    The aforementioned books, records, receipts, notes, ledgers, etc. are commonly maintained where controlled substance traffickers can have ready access to them;

E.     It is common for both small and large scale drug traffickers to secret contraband, proceeds of drug sales, and records of transactions in secure locations within their residence and/or other residences, either vacant or occupied by other members of the trafficking conspiracy (stash houses), and/or their businesses, to conceal them from law enforcement authorities;

F.     Persons involved in both small and large scale drug trafficking commonly conceal in their residences, stash houses and businesses caches of drugs, large amounts of currency, financial instruments (including stocks, bonds, certificates of deposit, etc.), precious metals, jewelry, automobile titles, other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to the attainment and concealment of large sums of money acquired from engaging in narcotic trafficking activities;

G.     When drug traffickers amass proceeds from the sale of drugs, the drug traffickers commonly attempt to legitimize these profits, i.e. "launder" the profits; to accomplish these goals, drug traffickers many times utilize domestic and foreign banks and/or financial institutions with their attendant services, including sales of securities, cashiers checks, money drafts, letters of credit, etc.; that other entities used to "launder" monies include brokerage houses,

real estate firms, shell corporation and purported legitimate business fronts;

H. It is common practice for both small and large scale narcotic traffickers to travel to distribution areas to purchase and otherwise facilitate their trafficking; that after purchasing controlled substances, the traffickers will transport or cause to be transported narcotics to areas in which they will distribute them; and that the methods of transportation include, but are not limited to trains, commercial airlines, ocean-going vessels, private airplanes, rental and private automobiles, and government and contract mail carriers;

I. Narcotics traffickers commonly maintain address or telephone numbers in books, documents and electronic/digital devices/media that relate names, addresses and/or telephone numbers of their associates in the trafficking organization;

J. Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residence and/or businesses of the traffickers;

K. The courts have recognized that the unexplained wealth is probative evidence of crimes motivated by greed, in particular trafficking in controlled substances; and

L.      Drug traffickers commonly have in their possession (that is on their persons, in their vehicles, and at their residences and/or their businesses), ammunition and firearms, including but not limited to handguns, pistols, revolvers, rifles, muzzle loaders, shotguns, machine guns, silencers and other weapons; that said ammunition and firearms are used to protect and secure a drug trafficker's property.

Dated at Burlington, in the District of Vermont, this 5 day of February, 2016.

_____
ROBERT ESTES
Task Force Agent, DEA

Sworn and subscribed before me this 5 day of February, 2016.

_____
JOHN M. CONROY
United States Magistrate Judge